UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BAYSHORE RECYCLING CORPORATION, | : : : : |
| Plaintiff, | : : CIVIL ACTION NO.: |
| vs. | : : JURY TRIAL DEMANDED |
| ACE AMERICAN INSURANCE COMPANY, | : : : |
| Defendant. | : : |

# COMPLAINT

Plaintiff Bayshore Recycling Corporation ("Bayshore"), by its undersigned counsel, brings this action against Defendant ACE American Insurance Company ("ACE"), and in support therefor, alleges as follows:

## THE NATURE OF THIS ACTION

1.  Bayshore brings this insurance coverage action against ACE for declaratory judgment, damages for breach of contract, and punitive damages for bad faith claims handling. Bayshore seeks to have this Court declare Bayshore's rights under ACE Policy EPR N0915842A (the "ACE Policy") for loss and damage caused by a fire on April 24, 2014 (the "Fire"). Specifically, Bayshore seeks a declaration of its rights to recover for damage and destruction of its property, along with certain other costs covered by the ACE Policy. Bayshore also seeks damages for breach of contract for ACE's refusal to pay and affirmative renouncement of its obligation to pay amounts owed under the ACE Policy, and punitive damages for ACE's bad faith claims handling.

2. The Bayshore Facility is a 55 acre complex in Keasbey, New Jersey, at which Bayshore engages in a number of operations, primarily involving recycling of construction materials and debris.

3. The April 25, 2014 Fire severely damaged a building (the "Building") containing Bayshore's sorting line and associated equipment (the "Sorting Line"). The Sorting Line, which is where construction materials and debris were triaged into elements that could be re-used or recycled, was the most critical element of Bayshore's operations. The damage from the Fire at the Bayshore Facility will be referred to as the "Fire Damage."

4. Bayshore gave ACE timely notice of the Fire Damage and sought full coverage for all loss and damage caused by the Fire. From the first, Bayshore was adamant that it would rebuild the Building and replace the Sorting Line and all other damaged property and equipment.

5. The ACE Policy obligates ACE to pay the Actual Cash Value ("ACV") of destroyed property and equipment. Payment of ACV is designed to permit Bayshore to finance rebuilding and replacement, after which the ACE Policy obligates ACE to pay the Replacement Cost Value ("RCV") of rebuilt and replaced property (if Bayshore rebuilds or replaces within two years of the date of loss).

6. In the fall of 2014, ACE calculated the RCV of the Building at less than $7,000,000, and thereafter made an advance based in large measure upon this calculation. This number was absurdly low, and was largely driven by ACE taking inappropriate and substantial deductions for depreciation of a structure that, being steel and concrete, had not depreciated because it did not lose substantial value over time. Bayshore's estimate of the ACV of the Building was nearly three times that ACE's number.

7. Further complicating Bayshore's efforts to get back into business after the Fire, ACE refused to advance Bayshore anything for the ACV of the Sorting Line and other equipment in the Building.

8. With ACE's paltry advances, Bayshore lacked the funding both: (i) to rebuild the Building and (ii) to replace the Sorting Line. Accordingly, to minimize the ongoing harm to its business, Bayshore chose to do the latter, and purchased a replacement Sorting Line for approximately $5,500,000, which was lower by millions of dollars than two other replacement bids it received. Further, given the destruction of the Building, Bayshore was forced to build out another building (the "Replacement Building") on site to house the Sorting Line, at a cost of approximately $400,000. These amounts essentially exhausted the amounts advanced by ACE for the ACV of the Building.

9. Over the course of the next five years, ACE purported to investigate Bayshore's loss. During this period, ACE refused to advance sufficient money to finance the reconstruction of the Building, and further refused to pay either the ACV or the RCV of the Sorting Line.

10. Eventually, in the spring of 2019, more than five years after the Fire, ACE finally provided its estimate of the RCV of the Sorting Line. This RCV was, like ACE's ACV for the Building, vastly understated, being more than a million dollars less than the actual amount Bayshore had paid for a replacement which, again, had been, by millions of dollars, the lowest bid it received to replace the Sorting Line. ACE refused to offer anything for the costs to build out the Replacement Building to house the replacement Sorting Line.

11. ACE's underpayment of the ACV for the Building and its delay in payment of either ACV or RCV of the Sorting Line is a breach of the ACE Policy, because the right to prompt payment is a critical component of first party insurance. Further, ACE's actions have

made it commercially impossible for Bayshore to replace the Building. ACE further owes other components of Bayshore's claim arising from its loss and damage from the Fire.

12. Bayshore has brought this Complaint for declaratory relief as to its rights under the ACE Policy to recover RCV for the Building and Sorting Line, along with other amounts covered by the ACE Policy. Bayshore further seeks declaratory relief that ACE, on account of its conduct, is precluded from arguing that its obligation to pay any of those amounts is relieved by any putative time limits in the ACE Policy. Bayshore also seeks damages for ACE's breach of the ACE Policy, and exemplary damages for ACE's bad faith claims handling.

## THE PARTIES

13. Bayshore is a New Jersey company with its principal place of business in Keasbey, New Jersey.

14. Upon information and belief, ACE is an insurance company incorporated under the laws of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this matter under 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

16. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this lawsuit took place within this District and the property which is the subject matter of this litigation is located in this District.

## FACTUAL BACKGROUND

### A. The ACE Policy

17. The ACE Policy provides $40,000,000 in insurance coverage "per occurrence excess of deductibles" for loss and damage arising from occurrences in the policy period

February 16, 2014 through February 16, 2015.  ACE Policy, at Declarations.  A copy of the ACE Policy is attached as Exhibit A hereto.

18. Bayshore paid $246,337 for the ACE Policy (ACE Policy, at Declarations), which constitutes all premium due under the ACE Policy.

### 1. **Property Damage**

19. The Property Damage provision for Real and Personal Property in the ACE Policy states:

> The interest of the Insured in all real and personal property (including improvements and betterments) owned, used, or intended for use by the Insured included Personal Property of Others in the insured's Care Custody and Control, or hereafter acquired and including Property owned by the Insured while in course of construction, erection, installation and assembly, all while at locations insured hereunder or within 1000 feet of such location listed on the latest Schedule of Locations submitted to and accepted by the Company as of the policy inception date.

ACE Policy, at § 8.A.

### 2. **Valuation**

20. The Valuation provision of the ACE Policy states:

> B. Buildings and structures, building equipment, plant equipment, machinery, machinery parts, tools, dies, patterns, office furniture, fixtures, and equipment and improvements and betterments:
>
> The amount actually expended by or in behalf of the Insured to repair, rebuild or replace, within a reasonable time, at the same or at another site, such property which has been damaged or destroyed by an insured peril, subject to the following conditions.
>
> Liability hereunder shall not exceed the smallest of the following:
>
> The costs to repair, rebuild or replace on the same site with new materials of like kind and quality, whichever is the smallest;
>
> The actual expenditures incurred in repairing, rebuilding or replacing on the same or another site within the same territorial limits of this policy, whichever is smallest;

In the event of loss or damage to such property that is not repaired, rebuilt or replaced within two (2) years from original date of loss, the basis of recovery shall be the actual cash value of the property at the time of loss with proper deduction for depreciation, and shall in no event exceed what it would then cost to repair or replace the property with material of like kind and quality within a reasonable time after such a loss.

ACE Policy, at § 12.B.

### 3. Professional Fees

21. The Professional Fees provision in the ACE Policy reads as follows:

**31. PROFESSIONAL FEES**

The Policy covers the actual cost incurred by the Insured, of reasonable fees payable to the Insured's accountants, auditors, or other professionals, excluding the cost of using the Insured's employees, for producing and certifying any particulars or details contained in the insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

ACE Policy, as § 31. The ACE Policy provides a $500,000 limit for Loss Adjustment Expenses.

ACE Policy, as § 3.

### 4. Suit Limitation

22. The ACE Policy contains the following suit limitation:

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all of the terms of this Coverage Part; and

**2.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

ACE Policy, at Commercial Property Conditions, D.

23. Further, Section 43 of the ACE Policy provides:

**43. LEGAL ACTION AGAINST THE COMPANY**

No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless the Insured shall have fully complied with all

>  the requirements of this policy.  The Company agrees that any action or proceeding against it for recovery of any loss under this policy shall not be barred if commenced within the time prescribed therefor in the statutes of the state of <u>New York</u>.

ACE Policy, as § 43.  Under New York law, the suit limitation in a property policy is deemed to be two years unless a longer period is provided.

### B. <u>Bayshore's Claim and ACE's Bad Faith Refusal To Pay</u>

24. The Fire damaged the Building and the Sorting Line, along with various other property.

25. Immediately after the Fire, it was obvious to all parties that it would cost many millions of dollars for Bayshore to replace the destroyed property.

26. In the Building destroyed by the Fire, Bayshore engaged in sorting of construction and demolition debris, via use of a Sorting Line.  Associated with the Sorting Line were a number of pieces of critical equipment, including a shear and a grinder.

27. Bayshore gave timely notice to ACE of the Fire Damage.

28. At all times after the Fire, Bayshore was intent on rebuilding and replacing all of the damaged and destroyed property as quickly as possible, as soon as the insurance issues were resolved and Bayshore could have certainty as to what costs it incurred in such reconstruction would be paid by ACE.  Bayshore specifically intended to replace as soon as possible the Building and the Sorting Line.

29. On November 12, 2014, ACE's representative JS Held estimated the ACV of the Building to be $6,887,111.00.  This estimate was dramatically lower than any good-faith realistic estimate of the ACV of the Building.  As an example, ACE's estimate deducted depreciation of the Building, despite the fact that the building was made of steel and concrete.  More important,

however, this dramatic under-estimate of the ACV resulted in a partial payment by ACE, which was insufficient to replace the Building.

30. By contrast, Bayshore's preliminary ACV for the building was $17,393,213.60, and its preliminary RCV was $19,759,605.60.

31. ACE never computed RCV of the Building.

32. Bayshore informed ACE that delays in replacement of the Sorting Line would harm its business and affect its customer base. Bayshore obtained three quotes from firms to replace the Sorting Line – of $7,852,567.00, $8,734,670.00 and $5,555,366.00 – eventually settling on the latter, a replacement manufactured by Green Machine of Hampstead, NH.

33. By mid-2015, ACE had advanced only $7,746,926.

34. Bayshore elected to replace the Sorting Line with the Green Machine Sorting Line. The money advanced by ACE in relation to the Building ACV was needed for, and was used, in large part, to purchase the replacement Sorting Line. Bayshore did not have sufficient money to replace the Sorting Line and other equipment and to finance replacement of the Building.

35. To install the new Sorting Line into the Replacement Building, Bayshore incurred substantial costs, as the Replacement Building was not ideally suited to house such a large set of equipment needing so much power. Specifically, Bayshore had to raise the roof of the Replacement Building, take out and replace the concrete floor, and add lighting, electrical and fire suppression equipment.

36. The cost of the Sorting Line from Green Machine was $5,555,366.00. Bayshore further paid $387,311.52 to build out the Replacement Building to install the replacement Sorting Line, along with additional internal costs for equipment and labor.

37. ACE's representative, Dan Shabat was provided with information relative to the replacement Sorting Line, but was instructed by ACE to cease work on this item shortly thereafter. Accordingly, in 2015, 2016, 2017 and 2018, ACE never calculated let alone paid Bayshore any amount for the ACV or RCV of the Sorting Line.

38. By August 1, 2015, the new Sorting Line was in service. The new Sorting Line could not handle the equivalent number of tons per hour as did the old Sorting Line.

39. The first real meeting ACE had with Bayshore with regard to the Building was on March 23, 2017, when the parties discussed the closure of the south wall. At this time, ACE informed Bayshore that Bayshore would not get paid for the Building until entire building claim was settled.

40. Throughout 2017 and 2018, Bayshore pressed ACE to resolve Bayshore's claim for the Sorting Line and for Mobile Equipment.

41. In the spring of 2019, Bayshore provided support for the expenses incurred in connection with the purchase and installation of the replacement Sorting Line, including electrical costs incurred in the installation. ACE indicated that these costs were not covered if they were "expenses incurred in placing the sorting line in another different building," and ACE would not pay to retrofit another building to put in the equipment.

42. Throughout the spring of 2019, Bayshore repeatedly requested ACE to provide its estimate of the RCV of the Sorting Line. On May 28, 2019, ACE finally submitted the report of ACE's expert, Mr. Shabat, as to the (1) Sorting Line ($4,273,697 on a claim of $5,721,408); and (2) mobile equipment ($1,076,163 on a claim of $1,138,163). ACE did not include any computation for the costs to build out the Replacement Building to install the Sorting Line, but indicated it would provide comments in "due time."

43. On July 18, 2019, ACE agreed to pay the undisputed amount of $4,829,925.89. ACE has advanced this amount.

44. In addition to the events described above, Bayshore has incurred other covered amounts, which ACE has not paid.

### C. Outstanding Claim Elements

45. ACE has refused to pay the following elements of Bayshore's claim:

| Category | Bayshore Claim | ACE Adjustment | Amount Owed |
|---|---|---|---|
| Building Replacement Cost | $19,759,605 (preliminary est'd. RCV) | $6,887,111.00 (ACV) | $12,872,494 |
| Mobile Equipment | $1,885,032.00 | $1,076,163.00 | $808,869 |
| Sorting Line | $5,678,048.00 | $4,273,697 | $1,404,351 |
| Costs To Refit the Replacement Building | As established at trial. | | |
| Claim Prep | $486,750.36 | $454,397.50 | $32,352.86 |
| Business Personal Property | As established at trial | | |
| Property of Others | As established at trial | | |
| Total | | | |

### THE CONTROVERSY

46. Based on the above circumstances, a justiciable case and controversy exists in relation to Bayshore's rights to coverage for the Sandy Damage under the ACE Policy.

47. Specifically, ACE has refused to pay amounts owed under the ACE Policy and to advance sufficient funds for the ACV of the damaged Building and the Sorting Line and other property and equipment to permit Bayshore to replace all of the property destroyed in the Fire.

48. Bayshore now seeks a declaratory judgment from this Court finding that ACE is obligated to provide insurance proceeds to Bayshore for its claim for loss and damage due to the Fire.

49. Further, Bayshore seeks damages for ACE's breach of the ACE Policy, and punitive and exemplary damages for ACE's bad faith claims handling practices.

### COUNT I – Declaratory Judgment

50. Bayshore repeats, realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 49 of this Complaint, as though fully set forth herein.

51. An actual and justiciable controversy has arisen between Bayshore and ACE concerning ACE's obligations under the ACE Policy.

52. Bayshore seeks, and is entitled to receive, a judicial determination of its rights under the ACE Policy and ACE's obligations to indemnify Bayshore. Specifically, Bayshore seeks a declaration:

(1) that ACE must pay the full RCV of the Building, and that ACE, by its conduct, is prohibited from asserting its obligation to pay this amount is relieved by any time limit in the ACE Policy;

(2) that ACE's refusal to pay proper ACV and RCV for the Building constitutes a breach of the ACE Policy;

(3) that ACE must pay the full RCV of the Sorting Line;

(4) that ACE's refusal to pay the full RCV of the Sorting Line constitutes a breach of the ACE Policy;

(5) that ACE must pay the full amount to refit the Replacement Building to house the Sorting Line;

(6) that ACE's refusal to pay the full amount to refit the Replacement Building to house the Sorting Line constitutes a breach of the ACE Policy;

(7) that ACE must pay the outstanding amounts for as established at trial; and

(8) that ACE's refusal to pay the outstanding amounts for constitutes a breach of the ACE Policy;

53. Judicial declarations are necessary and appropriate at this time in order that Bayshore and ACE may ascertain their rights and obligations under the ACE Policy.

## COUNT II – Breach of Contract

54. Bayshore repeats, realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 53 of this Complaint, as though fully set forth herein.

55. Bayshore has provided timely and sufficient notice and duly performed all the terms and conditions under the Policy, including any and all conditions precedent, and/or ACE has waived its right to enforce, or is estopped from enforcing, such terms and conditions.

56. ACE has breached the ACE Policy by wrongfully refusing to recognize and affirmatively renouncing its obligation to indemnify Bayshore for the covered losses described above.

57. Bayshore has suffered losses as a direct and proximate result of ACE's breach of its contractual obligations under the ACE Policy, in an amount to be proved at trial.

58. Further, Bayshore has suffered consequential damages as a result of ACE's breach of contract, in an amount to proven at trial.

## COUNT III – Bad Faith Claims Handling

59. Bayshore repeats, realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 58 of this Complaint, as though fully set forth herein.

60.     The ACE Policy contains an implied covenant of good faith and fair dealing that imposed upon ACE an obligation not to do anything to injure the rights of Bayshore to receive the benefits of the ACE Policy.

61.     ACE has engaged in bad faith claims handling practices by delaying adjustment of Bayshore's claim and by delaying payment of covered elements of that claim.

62.     ACE has engaged in bad faith claims handling practices by wrongfully failing or refusing, without proper justification, to recognize its obligation to indemnify Bayshore for covered losses.

63.     ACE has also engaged in bad faith claims handling practices by: misrepresenting the meaning of certain provisions of the ACE Policy; failing to acknowledge and act reasonably promptly upon communications with respect to claims; failing to conduct a meaningful and timely investigation of Bayshore's claims; failing to advise Bayshore regarding available coverage; and compelling Bayshore to institute litigation to recover amounts due under the ACE Policy.

64.     ACE's bad faith claims handling practices set forth above were committed knowingly or with a reckless disregard for its obligation to process and pay Bayshore's claims in good faith.

65.     As a direct and proximate result of ACE's bad faith claims handling practices and breaches of its fiduciary duties, Bayshore has suffered damages and consequential damages.

66.     ACE has consciously engaged in egregious misconduct in breaching its duty of good faith and fair dealing, warranting an award of punitive damages. Bayshore also seeks reimbursement of attorney fees and other costs of litigation.

## JURY DEMAND

67.     Bayshore hereby demands a trial by jury on all causes of action.

## **REQUEST FOR RELIEF**

WHEREFORE, Bayshore is entitled to (i) a declaration pursuant to 28 U.S.C. § 2201 by this Court that ACE is obligated to pay Bayshore the benefits owed to it under the ACE Policy; (ii) an award against ACE of compensatory, direct and consequential damages in the amount established by the evidence; (iii) punitive and exemplary damages; (iv) costs of suit, reasonable attorneys' fees, pre-judgment and post-judgment interest; and (v) such additional relief as the Court deems just and appropriate.

Dated:  December 19, 2019

                                      REED SMITH LLP

                                      /s/ *Paul E. Breene*
                                      Paul E. Breene
                                      Anthony B. Crawford

                                      Reed Smith LLP
                                      599 Lexington Avenue
                                      New York, NY 10022

                                      Princeton Forrestal Village
                                      136 Main Street
                                      Suite 250
                                      Princeton, NJ 08540
                                      Phone:  609 987 0050
                                      Fax:  609 951 0824
                                      pbreene@ReedSmith.com
                                      acrawford@reedsmith.com

                                      Attorneys for Bayshore Recycling Corporation